**2026 WI 25**

# Supreme Court of Wisconsin



CINCINNATI INSURANCE CO.,
*Plaintiff, Counter-Defendant, Respondent, Petitioner,*

*v.*

JAMES ROPICKY, et al.,
*Defendants, Counter-Plaintiffs, Third-Party Plaintiffs,*
*Appellants.*

No. 2023AP588
Decided July 7, 2026

REVIEW of a decision of the Court of Appeals
Waukesha County Circuit Court (Michael J. Aprahamian, J.) No.
2019CV371

BRIAN K. HAGEDORN, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., and REBECCA FRANK DALLET and JANET J. PROTASIEWICZ, JJ., joined. ANNETTE KINGSLAND ZIEGLER, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY and SUSAN M. CRAWFORD, JJ., joined.

¶1 BRIAN K. HAGEDORN, J.  On a spring morning in 2018, James Ropicky woke to a homeowner's nightmare. During a storm, rainwater poured into the home he shared with Rebecca Leichtfuss, causing severe damage. At the time, Ropicky had a homeowner's insurance policy provided by Cincinnati Insurance Company. Ropicky notified Cincinnati of the damage, and Cincinnati investigated his claim. Cincinnati

determined that the rainwater entered the home through a one-inch gap that constituted a construction defect from the time the house was originally built, and that rainwater had been entering the home for years. Cincinnati also determined that this persistent rainwater over the years allowed fungi to grow, and that the damage to the home was attributable to both rainwater and fungi. Ropicky's insurance policy contained exclusions that barred or limited coverage for damages resulting from construction defects and fungi. Relying on these provisions, Cincinnati paid Ropicky a sum of money far less than the damages incurred.

¶2     After these issues landed in court, the circuit court ruled that Cincinnati fulfilled its obligations under the policy and granted its motion for summary judgment. The court of appeals disagreed and held that factual disputes precluded summary judgment. Cincinnati appealed to this court, and we are now presented with questions about the meaning of the policy and whether summary judgment was properly granted.

¶3     First, the parties debate the meaning of the Ensuing Loss Exception to the Construction Defect Exclusion in the policy. We hold that in this case, any physical loss caused by rainwater constitutes an ensuing loss within the meaning of the policy.

¶4     Second, the parties disagree over whether the Fungi Additional Coverage provision constitutes an exception to the policy's Fungi Exclusion, or whether it is an independent grant of coverage that renders the exclusion inoperative. We conclude that the Fungi Additional Coverage is an exception to the Fungi Exclusion.

¶5     Finally, the parties contest whether there are genuine disputes of material fact regarding the construction defects and fungi damage. With our clarifications in view, we conclude that there are genuine disputes about whether a construction defect exists and how much of the ensuing loss was caused by the defects. There are also disputes about whether fungi was present and the extent to which it may have caused a loss. The circuit court's order granting summary judgment should therefore be reversed.

## I.  BACKGROUND

### A.  THE POLICY

¶6    Ropicky and Leichtfuss[1] shared a home together and purchased an Executive Classic Homeowner Insurance Policy. The policy covers a "direct 'physical loss' . . . and other covered costs caused by or resulting from a Covered Cause of Loss." And "physical loss" is defined by the policy as "accidental physical loss or accidental physical damage."

¶7    Cincinnati does not dispute that the water damage from the storm falls within the policy's general grant of coverage. It contends, however, that the damages are excluded by other provisions of the policy. Thus, we focus on two policy exclusions that would, if applicable, preclude coverage, and the exceptions to those exclusions that would, if applicable, reinstate coverage.

¶8    The first is the Construction Defect Exclusion, which reads:

"We" do not insure "physical loss" caused by . . . Faulty, inadequate or defective . . . Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction . . . Materials used in repair, construction, renovation or remodeling.

So if the home's "physical loss" is caused by a faulty, inadequate, or defective construction, this exclusion applies and damages are presumptively excluded from coverage.

¶9    However, the policy also provides that the Construction Defect Exclusion is inapplicable in certain circumstances. The Ensuing Loss Exception states that "any ensuing 'physical loss' to Covered Property" from the construction defect and "not precluded by any other provision in this policy is covered."

¶10    Thus, under the policy, a loss caused by a construction defect is not covered, but a loss ensuing from the construction defect is

_____

[1] Ropicky and Leichtfuss are litigating this case together as defendants and counter-plaintiffs. For simplicity, we refer to both collectively as "Ropicky."

covered. The question before us, addressed at length below, is how to interpret these two provisions and the interplay between them.

¶11    The other relevant exclusion in this case is the policy's limitation of coverage for losses caused by fungi. The Fungi Exclusion falls within a broader exclusion:

> "We" will not pay for "physical loss" resulting directly or indirectly by any of the following. Such "physical loss" is excluded regardless of any other cause or event contributing concurrently or in any sequence to the "physical loss". These exclusions apply whether or not the "physical loss" event results in widespread damage or affects a substantial area.

This is known as the Anti-Concurrent Cause Clause. The policy then lists which causes are excluded under that provision, including:

> "Fungi",[2] wet or dry rot, or bacteria meaning the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot or bacteria.[3]

Thus, if the loss resulted directly or indirectly from fungi, it is excluded from coverage.

¶12    But the Fungi Exclusion does not stop there. It continues:

> This exclusion does not apply . . . To the extent coverage is provided for in Section I, A.5. Section I Additional Coverage m. Fungi, Wet or Dry Rot, or Bacteria with respect to "physical loss" caused by a Covered Cause of Loss other than fire or lightning.

The exclusion then concludes:

---

[2] "Fungi" is defined as meaning "any type or form of fungus, and includes, but is not limited to, any form of mold, mushroom or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi."

[3] "'Fungi,' wet or dry rot, or bacteria" and its "growth, proliferation, spread or any activity" will be referred to simply as "fungi" throughout this opinion.

Direct loss by a Covered Cause of Loss resulting from "fungi", wet or dry rot, or bacteria is covered.

In short, the Fungi Exclusion "does not apply" if the policyholder purchased the additional coverage. Ropicky did so.

¶13　The additional coverage says that Cincinnati will provide coverage for:

The total of all "physical loss" payable under Section I – Property Coverages caused by "fungi", wet or dry rot, or bacteria.

It clarifies further:

If there is covered "physical loss" to Covered Property, not caused, in whole or in part, by "fungi", wet or dry rot, or bacteria, payment for "physical loss" will not be limited by the terms of this Additional Coverage, except to the extent that "fungi", wet or dry rot, or bacteria causes an increase in the "physical loss".

¶14　Concerning when fungi causes "physical loss," the policy states:

such increase in the "physical loss" will be subject to the terms of this Additional Coverage.

Translating this into English, when this additional coverage is purchased, Cincinnati promises to cover an amount of the "physical loss" caused by fungi rather than excluding all of it under the Fungi Exclusion. The policy then states that the amount of fungal damage that Cincinnati will cover under the Fungi Additional Coverage is $10,000.

¶15　With the relevant policy provisions laid out, we now address the events that led Ropicky to file an insurance claim in the first place, the competing understanding the policy, and the litigation that brought this case before us.

### B. THE STORM AND THE INITIAL AFTERMATH

¶16     The Ropicky residence was built in 2005. The two-story home was designed with twin towers in the front of the home and a great room at the rear. An exercise room sits directly below the great room on the lower level.

¶17     On the morning of May 11, 2018, Ropicky was awakened by a storm. He walked around his house and found that rainwater was streaming into the great room. Ropicky claimed the water was gushing through the wall across roughly sixteen feet at the top of the ceiling and on the top of the windows. For an estimated ten to fifteen minutes, he observed water entering the house and "running over the drywall, the windows, falling on the sill and starting to pool onto the floor." Neither he nor Leichtfuss had previously observed rainwater entering, or any signs of its presence.

¶18     Soon after the storm, Ropicky submitted a claim to Cincinnati for the water damage. Cincinnati claim representative Julie Didier spoke to Ropicky on the phone and then met with Leichtfuss at the home to discuss the damage. Leichtfuss described how water came in through the great room ceiling, traveled down the wall, and seeped into the exercise room below. Didier told her an engineer would need to evaluate the extent of the losses. Cincinnati retained Donald Krizan, the owner of Infratek Engineering Investigations, LLC, to do so. Didier did not mention that Krizan had an ongoing work relationship with Cincinnati.

¶19     While Ropicky and Leichtfuss were sorting through their claim with Cincinnati, they also began repairing their home. Before Krizan examined the home, Ropicky had Lee Kaul and his crew from Kaul Exteriors, including contractor Tim Hermann, investigate the water damage. Hermann's crew removed siding from the home to examine the wall area between the home's towers near the great room and exercise room.

¶20     After the evaluation by Kaul and Hermann had begun, Krizan visited the home to assess "visible exposed damage." Krizan did not check for hidden losses. Krizan later acknowledged he did not use typical diagnostic tools to determine what caused the damage. He also did not perform any sampling for mold or rot, nor did he take any physical samples of material or make any observation holes.

¶21    Krizan concluded that the water intrusion resulted from multiple construction defects in the home. In the rear of the home, Krizan determined that stormwater had infiltrated through a "gap between the vertical wall flashing . . . of the south tower roof and the rain gutter at the edge of the tower roof"—referred to as the "gutter gap" or the "one-inch gap." This alleged one-inch gap plays a key role in this case. Krizan also reported that Kaul said a gap existed prior to the inspection and was a cause of the water intrusion. Hermann, however, later testified that prior to the siding's removal, no one-inch gap existed between the siding and the roof line.

¶22    Krizan opined that water entered at the upper corner of the great-room wall, where it meets the bottom edge of the south tower roof, and then spread down across the wall of the exercise room below. He observed damage to "plywood sheathing and structural wall components due to the high moisture content and subsequent rot," including "virtual total disintegration" of all plywood sheathing within the path of stormwater penetration and severe damage to structural wall components, with the highest amount of damage near the bottom of the wall.

¶23    In the front of the home, Krizan determined that rainwater had also infiltrated "through a gap between the vertical wall flashing of an adjacent roof and a rain gutter," and through "a gap in the stone veneer on the north wall of the north tower," causing minor ceiling staining in the dining room. Krizan concluded that these gaps were created when the house was built and were therefore construction defects.[4] Furthermore, he determined that the damage from the rainwater was not just from the May 11, 2018 storm. Rather, "damage occurred with nearly every storm event." Thus, the damage to the home was the result of a multi-year process of water intrusion resulting from multiple construction defects.

---

[4] During a later deposition, Krizan acknowledged that the siding by the gap must have come off before he arrived, and that he could not say how wide the gap had been beforehand. He also acknowledged that he could not identify how the gap he observed failed to meet the Wisconsin Building Code or the home's original plans and specifications (which would be ways to determine if the gap was a construction defect).

¶24 Krizan also observed "significant, widespread rot and virtual total disintegration" to the OSB (Oriented Strand Board)[5] of the house, noting that damage "increased in severity with proximity to the ground." He described "damages to the plywood sheathing and structural wall components due to the high moisture content and subsequent rot," and noted that latent fungal spores had been "activated by higher moisture content in the OSB," leading to "subsequent fungal growth and wood deterioration."

¶25 After Krizan's initial inspection, he prepared a report with his findings and conclusions for Didier. Following Krizan's report, Didier sent a coverage determination letter to Ropicky. It noted that Krizan had found the one-inch gap, and Cincinnati determined it was a construction defect. Therefore, Cincinnati denied coverage for the cost to repair the one-inch gap. Further, the policy's Construction Defect Exclusion "would ordinarily exclude coverage not only for the cost to correct the defective workmanship and materials . . . but would also exclude coverage for any and all damage caused by the defective workmanship and materials." But Cincinnati stated that the "ensuing cause of loss provision . . . however, partially reinstates coverage for some damages that are caused by the defective workmanship and materials." Cincinnati therefore agreed to pay $2,138.53 to repair the damaged walls in the great room and exercise room and the water stains in the dining room. Cincinnati further agreed to pay $10,000 under the Fungi Additional Coverage for fungal damage. Cincinnati then issued a payment to Ropicky for $12,138.53.

## C. DISCOVERY OF ADDITIONAL DAMAGE

¶26 After this initial payment, Ropicky hired contractors to begin repairing the home. But as repairs continued apace and portions of the house were opened, the contractors discovered that the latent damage was considerably more extensive than Krizan's initial report revealed.

¶27 Because of this, Ropicky's counsel reached out to Didier advising that an independent investigation had uncovered significantly more damage than what Krizan had initially observed, and requested that Cincinnati reevaluate their claim. So Cincinnati again retained Krizan, and

---

[5] OSB is a type of wood paneling used in construction and was present near the surface of the home.

he returned to the Ropicky household for a second inspection. By that time, the structure had been substantially altered from its post-storm condition. Inspection ports had been cut through interior walls, the rear deck had been removed, and large sections of the stone veneer and house wrap were gone.

¶28 Krizan prepared his second report and again identified construction defects as the cause. According to Krizan, "The roof gutter drainage system was not adequately designed to deal with high volumes of water runoff, allowing for additional seepage and pooling at the base of the home, particularly in the river stone landscaping beds." He further concluded that the stone veneer was defectively designed and constructed because it extended below the grade of the river stone landscaping bed, creating conditions for water to seep upward at the veneer base. A properly designed installation would have maintained a gap above grade. Krizan also found the river-stone bed was not graded to drain away from the house, aggravating pooling at the foundation, and that a defect at the deck's attachment points let water into the home. In addition, rainwater caused some breakdown in the OSB, allowing fungi to grow. Krizan noted, "at all locations where I observed damages to the OSB those damages were the result of storm water penetration into the OSB and subsequent fungal growth and wood deterioration as latent fungal spores were activated by higher moisture content in the OSB." As was the case with his initial inspection, Krizan conducted no standard diagnostic testing and no physical samples were taken.

¶29 After receiving Krizan's updated findings, Cincinnati sent another letter to Ropicky. Cincinnati reiterated that the $10,000 Fungi Additional Coverage was applicable but had been exhausted. In addition, it now said the Ensuing Loss Exception to the Construction Defect Exclusion did not apply. Thus, it would not cover the water damage, would make no further payments.

¶30 Shortly after, Ropicky's counsel wrote to Cincinnati and advised that a "Bagster"—a large, bag-style portable dumpster—containing demolition waste from the home would be discarded soon and gave Cincinnati the opportunity to inspect the materials if it so chose. The Bagster was sitting outdoors exposed to the elements for up to a full year before collection. Krizan came and collected fifteen samples from the Bagster. According to Ropicky, the materials he removed were "junk" that could have come from anywhere, including from outside the home.

According to Cincinnati, the materials came from the back wall of the great room that had been repaired.

¶31    After he collected the samples, Krizan put them in a garbage bag and stored them in his personal garage where temperatures exceeded 70 degrees Fahrenheit. He knew that storing wet wood in such an environment can create conditions for mold to develop. The samples sat in Krizan's garage for approximately six months before being transferred to Cincinnati's litigation expert, Cassidy Kuchenbecker. Kuchenbecker photographed, inspected, and tested the fifteen samples. He concluded the samples' decay "was caused by fungal organisms," identifying both "brown rot"[6] and "white rot."[7] According to Kuchenbecker's supplemental report, experts on both sides had acknowledged that the photographs taken shortly after the loss depicted long-term water damage, and he concluded the OSB decay was the product of water infiltration occurring over numerous years.

## D.  THE PARTIES GO TO COURT

### 1.  *The Rise of Litigation*

¶32    Following Cincinnati's second letter and denial of coverage for most losses, Ropicky invoked the policy's appraisal process to resolve the dispute over the amount of coverage. Cincinnati refused in part, saying it would only participate in the appraisal process to determine the amount of coverage in the event a court found that the damages were covered.

¶33    Cincinnati then filed suit seeking a declaratory judgment that its policy provided no coverage beyond what it had already paid. Cincinnati asked the court to hold that the Construction Defect Exclusion and the Fungi Exclusion barred coverage for any damages besides the $10,000 in Fungi Additional Coverage already disbursed.

---

[6] Fungal decay breaking down hemicellulose and cellulose, causing the wood to turn brown and crack in cubical pieces.

[7] Fungal decay breaking down lignin, causing the wood to become white or yellow and spongy.

¶34 Ropicky brought counterclaims against Cincinnati for breach of contract, declaratory judgment, and bad faith. Ropicky also filed a third-party complaint against Krizan personally and his firm, Infratek Engineering Investigations. Ropicky claimed damages totaling $1,030,300. The circuit court then granted Cincinnati's request to bifurcate the bad faith claim.

## 2. *Discovery*

¶35 Ropicky retained several expert witnesses for the litigation: Dr. Jay Karls for civil and environmental engineering, Anthony Enea for residential construction, and Dr. Payam Fallah for fungi.

¶36 Dr. Karls is an engineer with experience in water damage and infiltration investigation. He could not inspect the home until several months after the storm, after contractors worked on the house. Because of this, Dr. Karls testified that he could not render a definitive opinion on what caused the great room water intrusion. Dr. Karls did, however, identify what he considered to be systematic deficiencies in Krizan's investigative approach. Dr. Karls attributed the structural wood damage to delamination—the mechanical debonding that occurs when wood is suddenly saturated—rather than fungal decay or rot.

¶37 Anthony Enea is a residential construction expert who was hired to examine the home's damage and identify mold and fungi. He also observed delamination, which he thought Krizan had misidentified as mold. Enea noted that the materials most affected by the water are not materials that mold typically affects. On the other hand, the materials mold does typically affect showed no signs of damage. Concerning the one-inch gutter gap, Enea said that he did not believe that the gap existed as Krizan described it. Rather it was more likely that the area was previously filled with material that had been removed. He also noted that it made no physical sense for water entering through a small, low-level gap to have produced the 16-foot ceiling-to-wall intrusion Ropicky described. Enea instead proposed an alternative explanation for the water damage. He testified that Krizan's analysis excluded—without any basis—one of the most common causes of stormwater intrusion: straight-line winds or wind-blown rain. He stated that Krizan's approach of inferring an unidentified defect solely from the presence of water damage "ignores the fact that there generally is not a defect when there is a loss caused by storm." But like Dr. Karls, Enea admitted that the east rear wall

was largely disassembled before he arrived, making it impossible to offer his own determination of what caused the water intrusion in that area.

¶38    Finally, Ropicky hired Dr. Payam Fallah as his fungi expert. He also opined that the damage was first caused by delamination, not fungal growth. Dr. Fallah explained that fungal growth on the wood after six months demonstrates only that the post-storm conditions were conducive to growth. He believes that no reliable assessment of the original conditions could be made, and characterized Kuchenbecker's findings as "flawed."

¶39    Cincinnati relied on the expert testimony of Krizan and Kuchenbecker. Krizan testified that his engineering degree and professional experience qualified him to determine both cause of loss and the existence of construction defects in a residential structure. Beyond the reports Krizan had previously given, he further testified that "this very significant amount of water intrusion does not and should not occur in a properly designed and constructed house." At the same time, he conceded that his first inspection was limited to visually exposed areas, that he used no standard diagnostic instruments, conducted no sampling, and admitted uncertainty about the dimensions of the gap. Cincinnati also relied on Kuchenbecker's initial and supplement reports, described earlier.

*3. Summary Judgment*

¶40    After discovery, Ropicky moved for partial summary judgment on the breach of contract counterclaim, asserting that Cincinnati failed to properly adjust their losses and had wrongfully refused to submit the claim to appraisal. Cincinnati filed a cross-motion for summary judgment seeking a declaration that the Construction Defect and Fungi Exclusions barred all coverage other than the $10,000 Fungi Additional Coverage already paid. Infratek and Krizan simultaneously moved for summary judgment on all third-party claims. The circuit court determined that Ropicky's expert failed to directly refute Cincinnati's experts. It also disagreed with Ropicky's interpretation of the Ensuing Loss Exception. The circuit court denied Ropicky's partial summary judgment motion, granted Cincinnati's motion, granted Infratek and Krizan's motions, and dismissed the bad faith claim.

*4. The Appeal*

¶41    Ropicky appealed.[8] *Cincinnati Ins. Co. v. Ropicky*, 2025 WI App 5, ¶22, 415 Wis. 2d 1, 16 N.W.3d 634. The court of appeals reversed the circuit court's grant of summary judgment because genuine issues of material fact remained. *Id.*, ¶74–75. It also interpreted two aspects of the insurance policy that we also address. *Id.*

¶42    Regarding Cincinnati's claim that the losses were foreclosed under the Construction Defect Exclusion, the court of appeals applied its prior controlling precedent on ensuing losses and held the rainwater was an ensuing loss. *Id.*, ¶¶31–48. The damage caused by the rainwater, therefore, was covered as an exception to the Construction Defect Exclusion. *Id.*, ¶¶40–41 (citing *Arnold v. Cincinnati Ins. Co.*, 2004 WI App 195, 276 Wis. 2d 762, 688 N.W.2d 708).

¶43    The court of appeals also offered an interpretation of the Fungi Exclusion. It concluded that the policy language stating the exclusion "does not apply" did not render it an exception to the Fungi Exclusion. *Id.*, ¶59. Rather, that language means that when the policy includes the Fungi Additional Coverage, the Fungi Exclusion is never triggered—i.e., it is inapplicable. *Id.* Judge Neubauer disagreed, concluding instead that the "does not apply" language creates an exception to the Fungi Exclusion. *Id.*, ¶79 (Neubauer, J., concurring).

¶44    We accepted Cincinnati's petition for review to consider the questions relating to the proper interpretation of (1) the Construction Defect Exclusion and Ensuing Loss Exception; and (2) the Fungi Exclusion and Fungi Additional Coverage.

---

[8] Ropicky chose not to appeal the rulings in favor of Krizan and Infratek. *Cincinnati Ins. Co. v. Ropicky*, 2025 WI App 5, ¶12 n.5, 415 Wis. 2d 1, 16 N.W.3d 634.

## II. DISCUSSION

### A. INTERPRETING INSURANCE POLICIES

¶45 The interpretation of an insurance contract is a question of law that we review de novo. *5 Walworth, LLC v. Engerman Contracting, Inc.*, 2023 WI 51, ¶13, 408 Wis. 2d 39, 992 N.W.2d 31.

¶46 Our "primary purpose in interpreting a contract for insurance is to give effect to the intentions of the parties." *Wadzinski v. Auto-Owners Ins. Co.*, 2012 WI 75, ¶11, 342 Wis. 2d 311, 818 N.W.2d 819. This is found primarily in the policy language itself. *Id.* We construe policy language as it would be understood by a reasonable insured, "giving the words used their common and ordinary meaning." *Id.* We also "look to the purpose of the particular insurance and the kind of coverage that a reasonable person in the insured's position would expect under the policy." *Id.*, ¶17.

¶47 We use a three-part framework for determining insurance coverage. *Id.*, ¶14. First, we determine whether an insurance policy's initial grant of coverage applies. *Id.* If so, we examine whether an exclusion applies that would remove coverage. *Id.* If an exclusion applies, the final step asks whether an exception to the exclusion applies, thereby reinstating coverage. *Id.*

¶48 At each step of the three-part inquiry, one of the parties bears the burden of proof. The insured bears the burden of showing that the policy provides an initial grant of coverage. *Am. Family Mut. Ins. Co. v. Schmitz*, 2010 WI App 157, ¶8, 330 Wis. 2d 263, 793 N.W.2d 111. If satisfied, "the burden shifts to the insurer to show that a policy exclusion nonetheless precludes coverage of the loss." *Id.* Finally, if the policy contains an exception to the exclusion, "the insured must show that the exception" applies. *Just v. Land Reclamation, Ltd.*, 151 Wis. 2d 593, 605, 445 N.W.2d 683 (Ct. App. 1989), *rev'd on other grounds*, 155 Wis. 2d 737, 456 N.W.2d 570 (1990).[9]

---

[9] At the court of appeals, Ropicky argued the insurer should bear the burden to prove an exception to an exclusion applies. However, Ropicky does not renew that argument before us. Therefore, we need not revisit the description of the burden as outlined by the court of appeals in *Just v. Land Reclamation, Ltd.*, 151 Wis. 2d 593, 605, 445 N.W.2d 683 (Ct. App. 1989), *rev'd on other grounds*, 155 Wis. 2d 737, 456 N.W.2d 570 (1990). We observe that *Just* is consistent with cases

¶49    In this case the parties agree that the damage to the Ropicky's home falls within the insurance policy's general coverage. Cincinnati asserts that two exclusions limit or eliminate that coverage: the Construction Defect Exclusion and the Fungi Exclusion. The parties again agree that both exclusions may apply—although they disagree as to whether the facts bear this out. Ropicky therefore has the burden to prove that exceptions apply to the Construction Defect Exclusion and the Fungi Exclusion.

B.  APPLICATION TO THIS POLICY

¶50    With these interpretive principles in mind, we turn to the policy provisions before us. We begin with our interpretation of the Construction Defect Exclusion and the Ensuing Loss Exception, and then move to the Fungi Exclusion and Fungi Additional Coverage provisions.

*1. Construction Defect Exclusion and Ensuing Loss Exception*

¶51    It is common for insurance policies to "contain ensuing loss provisions that operate as exceptions to exclusions." David J. Marchitelli, *What Constitutes "Ensuing Loss" Caused by Water Damage Within Coverage Provision of Property Insurance Policy*, 14 A.L.R. 7th Art. 6, § 1 (orig. pub. 2016). Originally created for damages involving fire or earthquakes, the ensuing loss clause has evolved "to ensure that losses caused at least in part by a covered peril remain covered under property policies even if an excluded peril also played a role in causing the loss." Chris French, *The "Ensuing Loss" Clause in Insurance Policies: The Forgotten and Misunderstood Antidote to Anti-Concurrent Causation Exclusions*, 13 NEV. L.J. 215, 217 (2012). Thus, although coverage may be denied for the damages initially caused by the excluded cause, an ensuing loss exception secures coverage for the losses that follow from the excluded cause. Marchitelli, *supra*, § 1.

from other jurisdictions. *Kesling v. Am. Fam. Mut. Ins. Co.*, 861 F. Supp. 2d 1274, 1284 (D. Colo. 2012) ("[T]he burden shifts to the policyholder to establish an exception to an exclusion."); *Hudnell v. Allstate Ins. Co.*, 945 P.2d 363, 365 (Ariz. Ct. App. 1997) ("[T]he insured carries the burden of proving that his claim falls within an exception to that exclusionary clause."); *Telepak v. United Servs. Auto. Ass'n*, 887 S.W.2d 506, 506 (Tex. Ct. App. 1994) ("We hold that the applicability of an exception to an exclusion is a question of coverage, on which the insured has the burden of proof.").

An ensuing loss clause's "very purpose" is to "clarify that the exclusions should not swallow the basic coverage provided by the policy." French, *supra*, at 219.

¶52 The coverage provided by ensuing loss exceptions varies from policy to policy. Marchitelli, *supra*, § 2. Nevertheless, it is typical, especially in the case of water damage, that ensuing loss exceptions simply restore the coverage the policy generally covers in the absence of an exclusion, and adheres to the limits of the policy's initial grant of coverage. *Id*. It is also typical that an ensuing loss clause does not apply to the original, defective property that suffered damages from the excluded cause, and is instead reserved to, as the name suggests, providing coverage for ensuing damage to distinct property. *Id.*

¶53 The Construction Defect Exclusion in this case says that Cincinnati does "not insure 'physical loss' caused by" "Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction . . ." The Ensuing Loss Exception says, "any ensuing 'physical loss' . . . not precluded by any other provision in this policy is covered."

¶54 This language has proved troublesome for courts to make sense of. On the one hand, the policy will not cover the "physical loss" caused by the construction defect, yet it will cover the ensuing loss that follows from the construction defect. As one scholar observed, "How can a loss that is caused 'directly or indirectly' by certain perils be excluded from coverage under the exclusionary language but simultaneously be covered if the loss nonetheless ensues from a non-excluded peril?" French, *supra*, at 220.

¶55 Nonetheless, our task is to interpret these two clauses in harmony such that neither is functionally erased and the intentions of the parties are fulfilled. The exception cannot be allowed to swallow the exclusion, but the exception must also not be rendered a dead letter. Both must be preserved and operational.

¶56 Given the tension inherent in the language, courts have interpreted this language in significantly different ways. Some apply the ensuing loss exception only when "a covered peril" becomes the "efficient and proximate cause of the loss," overriding the original and excluded

cause of the damage.[10] Other courts interpret the ensuing loss exception "to provide coverage for any otherwise covered loss that took place afterward or as a consequence or result of the faulty workmanship."[11] Others interpret the exception to require "an independent and covered loss" to occur "subsequent to the excluded acts or omissions giving rise to losses."[12]

¶57     Cincinnati asks us to join the ranks of the "proximate cause" jurisdictions and hold that an ensuing loss requires a break in the causal chain. Ropicky asserts that Wisconsin case law already answers the question and takes a broader view of the ensuing loss exception.

¶58     The court of appeals largely addressed and answered this question in *Arnold v. Cincinnati Ins. Co.*, 2004 WI App 195, 276 Wis. 2d 762, 688 N.W.2d 708. In a case with parallels to our own, the Arnolds hired contractors to ameliorate staining on the siding of their house caused by mold and mildew. *Id.*, ¶¶5–6. The crew used a pressure washer on the cedar siding to remove the mildew, but it did not go as planned. *Id.*, ¶7. Afterwards, the Arnolds found "damage to the windows, gutters, driveway, porch, patio, roof, and doors due to direct contact with [the contractor's] stripping product, as well as damage to the interior of their home, including the walls, ceiling, and carpeting, due to water and the stripping product leaking in from the damaged seals of the windows and skylights." *Id.*, ¶10. Beyond this, however, evidence suggested some of the

---

[10] *Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948, 952 (8th Cir. 2012); *see Prudential Prop. & Casualty Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-St., 2002 WL 31495830, *19–*20 (D. Ore. June 18, 2002); *TMW Enterprises, v. Federal Ins. Co.*, 619 F.3d 574, 579 (6th Cir. 2010).

[11] *Leep v. Trinity Universal Ins. Co.*, 261 F. Supp. 3d 1071, 1084 (D. Mont. 2017); *see BSI Constructors, Inc. v. Hartford Fire Ins. Co.*, 705 F.3d 330, 334 (8th Cir. 2013); *Selective Way Ins. Co. v. Nat'l Fire Ins. Co. of Hartford*, 988 F. Supp. 2d 530, 538 (D. Md. 2013); *19900 W Nine Mile, LLC v. Hanover Ins. Co.*, 676 F. Supp. 3d 534, 543 (E.D. Mich. 2023); *Dawson Farms, L.L.C. v. Millers Mut. Fire. Ins. Co.*, 794 So.2d 949, 952 (La. Ct. App. 2001); *Bartram, LLC v. Landmark Am. Ins. Co.*, 864 F. Supp. 2d 1229, 1235 (N.D. Fla. 2012); *Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 444, 454 (W.D. Ken. 2007).

[12] *Taja Inves. LLC v. Peerless Ins. Co.*, 196 F. Supp. 3d 587, 592–93 (E.D. Va. 2016).

damage was caused by rain leaking into the home through the damaged caulking. *Id.*, ¶36. The Arnolds claimed that the crew's "failure to take proper measures in applying the stripping product" caused those damages. *Id.*, ¶11.

¶59 As relevant for our purposes, while the repair work fell within the faulty workmanship and materials exclusions, the court of appeals considered the Arnolds' claim that the policy's Ensuing Loss Exception reinstated coverage. *Id.*, ¶¶20–24. The court of appeals focused on the word "ensue." It held that "an ensuing loss is a loss that is not directly caused by faulty workmanship or faulty materials, but nonetheless follows as a 'chance, likely, or necessary consequence' of the loss caused by faulty workmanship or faulty materials." *Id.*, ¶¶27–28 (citing WEBSTER'S THIRD INTERNATIONAL DICTIONARY 756 (1993)). This does not mean "all losses that follow and are a consequence of" an excluded cause are considered an ensuing loss. *Id.*, ¶29. This would be too broad and would eviscerate the Faulty Workmanship and Faulty Materials Exclusions. *Id.* Thus, the court of appeals concluded "that a reasonable insured would understand that, in addition to being a loss that follows as a chance, likely, or necessary consequence of the excluded loss, an ensuing loss must result from a cause in addition to the excluded cause." *Id.*

¶60 The court of appeals held that "the loss consisting of the deterioration of the caulking, the discoloration or other damage to the window frames and door frames, and the discoloration or other damage to other parts of the exterior of the house and the driveway" were "plainly excluded under the policy." *Id.*, ¶35. The court further found that "any damage to the interior [of the house] by leakage from the pressure washer" was excluded. *Id.*, ¶37. These damages all fell under the Faulty Workmanship or Faulty Materials Exclusions. *Id.* They were the direct result of the defective work, and nothing else. They were not what ensued after the defect, but rather they were directly caused by the excluded peril. They were therefore barred from coverage.

¶61 However, damages resulting from rain were different. *Id.*, ¶38. The rainwater followed as a consequence of the faulty workmanship because the damage was caused by "rain leaking in through the damaged caulking." *Id.*, ¶40. The rain also constituted a cause in addition to the faulty workmanship. *Id.* The court rejected the notion that the secondary cause needed to be a separate and independent peril. *Id.* It was enough that rain constituted an additional cause of damage beyond just the faulty workmanship. *Id.* Thus, while damage caused by the faulty workmanship

itself was excluded by the policy, damage flowing from the faulty workmanship and resulting from a secondary cause—the rain—constituted an ensuing loss under the policy. *Id.*, ¶42.

¶62    Cincinnati does not explicitly ask us to overturn *Arnold*, but the policy interpretation it proffers runs headlong into *Arnold*'s holding and reasoning. Though we acknowledge other courts take a different view, *Arnold*'s interpretation is reasonable and deserves some prudentially grounded respect. While this court owes no stare decisis deference to decisions of the court of appeals,[13] there are good reasons to be cautious before overturning a more than two-decade old decision like this. *See State v. Lira*, 2021 WI 81, ¶¶44–45, 399 Wis. 2d 419, 966 N.W.2d 605. The court of appeals has issued an authoritative interpretation of policy language that applies statewide. Insurers rely on court decisions like this when crafting new policies, and they rely on the language they write reflecting the state of the law at the time they write it. If an insurer wishes a policy to have a different mix of coverages, we would expect different, more precise, and clearer language. But when a new policy uses substantially the same language with a determinate meaning, this reflects an intention to have that same meaning. At the very least, overturning *Arnold* in this case—where the holding and facts are so clearly on point—raises a real risk of upsetting the settled expectations of the parties to this insurance contract.

¶63    Beyond these reliance interests, we also find the reasoning of *Arnold* persuasive and therefore adopt it. The Construction Defect Exclusion here provides that Cincinnati will not "insure 'physical loss' caused by . . . Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction." That language is not necessarily limited to the cost to repair the construction defect as a categorical rule. The language seems to encompass all losses caused by the construction defect unless an exception applies. Damage caused solely by the defective part of the home would seem to be a loss caused by the defect and therefore excluded from coverage in the first instance. An ensuing loss exception cannot be read so broadly as to allow every defect-caused loss to be covered; this would make the exception swallow the exclusion altogether. *Arnold* therefore reconciles this by requiring an additional cause of loss to trigger the ensuing loss exception.

---

[13] *See Evers v. Marklein*, 2024 WI 31, ¶25, 412 Wis. 2d 525, 8 N.W.3d 395.

¶64 On the other hand, interpreting the Ensuing Loss Exception too narrowly can likewise render it largely inapplicable. For example, in *TMW Enterprises, Inc. v. Federal Insurance Company*, poorly installed walls allowed water to seep into the building. 619 F.3d 574, 576 (6th Cir. 2010). The Sixth Circuit reasoned that allowing water damage from the defect to count as an ensuing loss would kill the initial defect exclusion; it instead applied a proximate cause test to determine coverage. *Id.* at 579. It explained, "because defective wall construction naturally and foreseeably leads to water infiltration, the language of the exclusion, not the exception to the exclusion, ought to apply." *Id.*

¶65 Applying this to the present case would mean the storm leading to rainwater pouring into the house would be insufficient; another intervening cause would be necessary to trigger an ensuing loss. For example, had the water damage caused something to explode and break out into a fire, then that explosion would shift the proximate cause from the defect to the explosion, and the exclusion would no longer apply. Under this reading of the exception, no damages would be covered without something breaking the causal link such that the defect is no longer the proximate cause of the damage.

¶66 We find *Arnold*'s approach more persuasive. The exception simply says that any "ensuing 'physical loss' . . . is covered." Ensuing generally means something that happens as a consequence of or immediately after a prior event. "Ensuing," WEBSTER'S THIRD INTERNATIONAL DICTIONARY 756 (1993). Read naturally, a loss that flows as a consequence of, and follows, a construction defect fits within this definition. *Arnold* adopts a reading of the ensuing loss language that is more consistent with normal language: that to ensue means to follow as "chance, likely, or necessary consequence." The policy language simply does not suggest a narrow, proximate-cause like meaning. The proximate-cause reading requires not only that there be an "ensuing loss," but that there be a cause in the chain so unique it breaks the causal chain, and only then are the losses covered. That is not the best reading of the policy language. For these reasons, we adopt the rule from *Arnold*.

¶67 And applying *Arnold*'s holding regarding rainwater as an ensuing loss is straightforward. In *Arnold*, because of faulty workmanship and materials, rainwater leaked through damaged caulking and caused damage to the home that went beyond the faulty work itself. 276 Wis. 2d 762, ¶36. In our case, rainwater leaked in allegedly due to defective construction, causing significant damage. This rain, just like in

*Arnold*, was an additional cause. In both cases, rainwater coming into the house was "a chance, likely, or necessary consequence of the excluded loss" and the rainwater provided "a cause in addition to the excluded cause." *See id.*, ¶29. Thus, just as in *Arnold*, the Ensuing Loss Exception operates to reinstate coverage to the extent the loss is established by the facts. While the cost of repairing the construction defect itself would not be covered, the ensuing loss caused by the rainwater that came as a consequence of the construction defect would be an ensuing loss. Therefore, it would be covered under the policy as long as other limits do not apply.[14]

### 2. *Fungi Exclusion and Fungi Additional Coverage*

¶68  We also write to clarify the proper way to read the Fungi Exclusion and Fungi Additional Coverage provisions. Judge Neubauer disagreed with the court of appeals majority about the proper way to interpret these provisions, and the parties take up their causes here too.

¶69  The Fungi Exclusion says that if "'Fungi', wet or dry rot, or bacteria meaning the presence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or bacteria" caused the "physical loss," then Cincinnati won't pay for it. And in this case, Cincinnati is claiming that mold caused the damage. So even if the Ensuing Loss Exception does apply, it still will not pay to cover those damages to the extent they fall under this exclusion.

¶70  However, the Fungi Exclusion lays out situations where it "does not apply," including when the policy owner bought the "Additional Coverage." The policy provides that those same damages caused by fungi that would normally not be covered are covered up to $10,000 with the "Additional Coverage," which Ropicky had.

---

[14] Although the dissent says the rainwater damage in *Arnold* is different, it never explains why. The dissent also argues that our ruling today will cause insurance costs to "skyrocket." We find it unlikely that reaffirming and applying a two-decade old precedent will introduce instability and chaos into the home insurance market. Moving forward, if Cincinnati wishes to alter this coverage in the future, it can ensure new policies contain different language making this clear.

¶71    Cincinnati agrees with Judge Neubauer that the Fungi Additional Coverage should be read as an exception to the Fungi Exclusion. Ropicky argues and the court of appeals majority holds that the Fungi Additional Coverage is not an exception to the Fungi Exclusion, but instead it is a Fungi Endorsement that renders the exclusion inoperative altogether. *Ropicky*, 415 Wis. 2d 1, ¶¶52–53, 58–59. According to the court of appeals majority, "This exclusion does not apply" means that the exclusion is never triggered because the Fungi Endorsement is operative in lieu of the normal Fungi Exclusion. *Id.*, ¶¶58–59.

¶72    The majority looked to the dictionary and found "apply" means "to bring into action," "to put into operation or effect," or "[t]o put into action[.]" *Id.*, ¶60. It also reasoned that this is how a reasonable insured would understand the word "apply" in this context, and that this interpretation was necessary to avoid a conflict in the terms of the contract. *Id.*, ¶¶61–62. Otherwise, it reasoned that the contract would make no sense because the provisions would contradict each other by simultaneously providing coverage and excluding coverage. *Id.*, ¶62. The majority rejected Cincinnati's interpretation, saying "the most reasonable and straightforward reading of the relevant language is that the Fungi Exclusion 'does not apply' if, or so long as, coverage is provided for in the referenced 'Fungi Additional Coverage' section." *Id.*, ¶67. It held that the Fungi Exclusion was inapplicable and that the Fungi Additional coverage limited the amount of damage Cincinnati is required to pay to $10,000. *Id.*, ¶71. At the same time, the court of appeals clarified that "covered losses 'not caused, in whole or in part, by fungi, wet or dry rot, or bacteria'" remain covered. *Id.*

¶73    We agree instead with Judge Neubauer's interpretation. While the court of appeals may be correct that "does not apply" in some instances means that something is never put into effect, that is not necessarily how the phrase is used in insurance policies. For example, in *American Family Mutual Insurance Company v. American Girl, Inc.*, we examined an exclusion that denied coverage for certain property damage and provided: "This exclusion *does not apply* if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." 2004 WI 2, ¶67, 268 Wis. 2d 16, 673 N.W.2d 65 (emphasis added). We did not interpret this to mean that the exclusion was inoperative and exceptionless, merely replaced by something new. Rather, we said the exclusion "would operate to exclude coverage . . . but for the *exception* that specifically restores coverage when the property damage

arises out of" a subcontractor's work. *Id.* (emphasis added). The court of appeals' concern, then, is of no avail; it is no contradiction to deny coverage in an exclusion, while providing coverage in an exception to that exclusion. As Judge Neubauer notes, many other cases interpret the language the same way.[15]

¶74    The Fungi Exception and Fungi Additional Coverage operate under the same principle. First, we ask whether fungi caused the damages. If so, then the exclusion applies and such damages are presumptively not covered. But then we ask if an exception to the exclusion applies. In this case, the answer is yes. Ropicky purchased additional coverage restoring coverage up to $10,000. This operates like other exclusions and exceptions to those exclusions.

¶75    Cincinnati argues that the Fungi Exclusion's Anti-Concurrent Cause of Loss clause would bar coverage for Ropicky's damages above $10,000 where fungi contributed to the damages. But as Judge Neubauer explains, "the Fungi Exclusion (including the anti-concurrent cause clause) does not apply to exclude coverage for any of the Ropickys' claimed damages because the Ropickys' policy contains the Fungi Additional Coverage endorsement." *Ropicky*, 415 Wis. 2d 1, ¶81 (Neubauer, J., concurring). By purchasing the additional fungi coverage, "the policy triggers the exception to the Fungi Exclusion and renders the exclusion inapplicable." *Id.* (Neubauer, J., concurring).

¶76    The policy provides the Fungi Additional Coverage as an exception to the Fungi Exclusion. The coverage allows Ropicky to recover up to $10,000 for the damage caused by fungi, which Cincinnati has paid. But as we explain below, whether there were fungi, when fungi appeared,

---

[15] *See Ropicky*, 415 Wis. 2d 1, ¶¶77–79 (Neubauer, J., concurring) (citing *5 Walworth, LLC v. Engerman Contracting, Inc.*, 2021 WI App 51, ¶¶33–34, 399 Wis. 2d 240, 963 N.W.2d 779, *aff'd*, 2023 WI 51, 408 Wis. 2d 39, 992 N.W.2d 31; *Vandenberg v. Continental Ins. Co.*, 2001 WI 85, ¶¶13–14, 244 Wis. 2d 802, 628 N.W.2d 876; *Ruff v. Graziano*, 220 Wis. 2d 513, 519, 521, 583 N.W.2d 185 (Ct. App. 1998); *Heikkinen v. United Servs. Auto. Ass'n*, 2006 WI App 207, ¶10, 296 Wis. 2d 438, 724 N.W.2d 243, *aff'd by an equally divided court*, 2007 WI 124, 305 Wis. 2d 68, 739 N.W.2d 489 (per curiam); *U.S. Fire Ins. Co. v. Good Humor Corp.*, 173 Wis. 2d 804, 828–29, 496 N.W.2d 730 (Ct. App. 1993); *Heinecke v. Aurora Healthcare, Inc.*, 2013 WI App 133, ¶¶4–5, 351 Wis. 2d 463, 841 N.W.2d 52).

and how much damage it caused are genuine disputes of material fact that must be decided by the jury on remand.

## C. SUMMARY JUDGMENT STANDARD OF REVIEW

¶77    We review summary judgment de novo, using the same standards and methodology as the circuit court and benefitting from their analyses. *Quick Charge Kiosk LLC v. Kaul*, 2020 WI 54, ¶9, 392 Wis. 2d 35, 944 N.W.2d 598. "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *5 Walworth, LLC*, 408 Wis. 2d 39, ¶13, (citation modified). The key question in determining whether factual issues exist is what a reasonable jury could conclude from the evidence. *See Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 2002 WI 80, ¶18, 254 Wis. 2d 77, 646 N.W.2d 777. When examining the evidence, we view it in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Metro. Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶20, 291 Wis. 2d 393, 717 N.W.2d 58.

## D. SUMMARY JUDGMENT ANALYSIS

¶78    We conclude genuine disputes of material fact exist. We examine the record on each issue, starting with the factual disputes revolving around the Construction Defect Exclusion and Ensuing Loss Exception and then moving to those that pertain to the Fungi Exclusion and the Fungi Additional Coverage.

### 1. The Construction Defects

¶79    Before examining where the parties disagree about the alleged construction defects, it is helpful to establish what is and is not in dispute regarding the existence of construction defects. It is not Ropicky's position that the house was entirely free of construction defects or that no damage was caused in part by a construction defect. Rather, Ropicky concedes that construction defects existed that caused losses on the front and sides of the house.

¶80    The conceded defects are limited to two areas in the home and the damages in those parts of the home. Ropicky concedes Krizan's finding of a gap in the north tower flashing at the front of the home, which allowed rainwater to enter the joist space above the dining room and cause minor ceiling staining. Ropicky's expert, Enea, acknowledged

construction quality issues on the front and sides of the home such as the gutters being too small; grades on the sides and front being too high; the foundational elevation being too low; thin-stone veneer being improperly installed; and downspouts insufficient for the home. But it is here that the parties' agreement ends and material factual disagreements begin.

¶81    While Ropicky conceded the existence of those construction defects, he argues the parties have never agreed how much of the loss flows from those defects and what portion of the ensuing loss damage was properly adjusted. While Cincinnati did pay $2,138.53 for these damages, Ropicky maintains that the full scope of the ensuing losses was never determined or paid. This disagreement over the extent of the damage caused by the admitted construction defects constitutes a material dispute of fact. Nothing in the record before us conclusively determines which damages were due to which purported defects.

¶82    The factual disputes do not stop there. Ropicky claims the admitted construction defects do not bear on the rear east wall damages, where the bulk of the claimed loss occurred. Ropicky notes instead that where most of the damage occurred, there was no stone veneer, there was a different structural system, and there were different drainage characteristics.

¶83    Even more, Ropicky disputes whether one particular construction defect even exists: a gap allowing rainwater to enter the home. Cincinnati's experts, Krizan and Kuchenbecker, testified to the existence of the gap and to damages consistent with that defect allowing rainwater to enter the home for years. Kaul also allegedly spoke in support of the existence of the one-inch hole. The Ropicky witnesses—Hermann, Enea, Dr. Karls, and Dr. Fallah—present a different story. They deny that a one-inch gap existed before construction material was removed during the investigation and repairs. They also deny that Cincinnati has proved that the gap would constitute a construction defect. The Ropicky experts also attack both Krizan's methodology as unreliable and accuse him of bias due to his relationship with Cincinnati.

¶84    Cincinnati points out that the Ropicky experts have failed to create their own positive theory of what caused the damage to the home. So, Cincinnati claims, we must accept Krizan's theory. This is incorrect. In construing the facts most favorably to Ropicky, we conclude that a reasonable jury could reject Krizan's theory. The Ropicky experts present evidence that could refute Krizan's theory, and a reasonable jury could

also consider his allegedly biased relationship with Cincinnati. A jury could also rely on the expert testimony that most rain damage is not caused by a defect, the averment that Ropicky and Leichtfuss never observed rain damage until the storm, and the witnesses who deny the existence of a construction defect. A jury could also agree Ropicky's experts that the loss was attributable to delamination from rainwater, not years of fungi because of persistent rainwater.

¶85    In short, the record here does not conclusively establish the existence of the disputed construction defect, nor does it determine the scope of damages such a defect may have caused, especially given our conclusion that the ensuing loss exception would apply to reinstate coverage for some damages. The circuit court erred in granting summary judgment because genuine disputes of material fact exist to preclude summary judgment on the issue of the Construction Defect Exclusion.

*2.  The Presence and Effect of Fungi*

¶86    Moving to the Fungi Exclusion, Cincinnati has already paid the $10,000 limit for fungal damage in the policy. Nevertheless, if there are genuine disputes of material fact about whether fungi was in fact present or the cause of the damage, then Ropicky may be entitled to more coverage for losses. Krizan determined that the OSB sheathing and structural components were damaged by "high moisture content and subsequent rot" and "fungal growth." However, Ropicky's expert witnesses pointed to a different cause: delamination, a form of damage that can occur when wood is suddenly saturated with water. Dr. Fallah said this sudden saturation could cause damage that seems like fungi but is not. He also asserted that Krizan's inspection photos did not reveal images that would be typical of fungi. Hermann, too, observed delamination when his crew opened up the home for repairs. Enea denied observing mold, fungi, rot, or bacteria when he examined the home in 2018. Dr. Karls also claimed that the damage was caused by delamination rather than fungi, rot, or bacteria. If it is true that the fungi did not form until after the storm, then the damage would not have been caused either directly or indirectly by the fungi, and the Fungi Exclusion would not come into play.

¶87    Disputes also exist about whether the fungi samples that were tested by Kuchenbecker are reliable. Krizan admits that the samples tested were kept in a garbage bag for six months, exposed to the elements in the Bagster before giving them to Kuchenbecker, and admits that the

materials could have come from anywhere. He also admitted to not drying the samples before bagging them, which can cause mold. This chain of custody led Dr. Fallah to opine that testing results regarding the presence of fungi could not be trusted. This shows a clear dispute over material facts regarding the existence of fungi and the extent to which fungi caused a loss.

\* \* \*

¶88   When material factual disputes exist, a fact-finder must resolve those disputes. It is the trier of fact who sifts through the evidence to determine the facts supporting the claim. Material factual disputes exist in this case for both the Construction Defect Exclusion and the Fungi Exclusion. Summary judgment is therefore precluded, and we affirm the court of appeals' reversal of summary judgment.

## III.  CONCLUSION

¶89   In summary, we hold that "physical losses" caused by the rainwater constitute an ensuing loss and fall within the exception to the Construction Defect Exclusion. We further hold that the Fungi Additional Coverage is an exception to the Fungi Exclusion. As it concerns summary judgment, we conclude that genuine disputes of material fact exist that preclude summary judgment for both the Construction Defect Exclusion and the Fungi Exclusion. In addition, because Ropicky's bad faith claim was dismissed by the circuit court on summary judgment, which we now reverse, it should be reinstated on remand.

*By the Court.*—The decision of the court of appeals is affirmed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

ANNETTE KINGSLAND ZIEGLER, J., with whom REBECCA GRASSL BRADLEY and SUSAN M. CRAWFORD, JJ., join, dissenting.

## I. INTRODUCTION

¶90     The court's approach to the ensuing-loss exception expands *Arnold*'s[1] scope to cover losses beyond the terms of the parties' insurance policy, unnecessarily broadening Wisconsin's ensuing-loss jurisprudence in its wake. *Arnold* is not as expansive as the majority's application today. It, like most jurisdictions, requires a cause of loss independent from the excluded cause of loss to trigger the ensuing-loss exception. This case presents an opportunity for our court to clarify when ensuing-loss provisions act as exceptions to exclusions for faulty workmanship and construction in homeowner-insurance contracts. While the court of appeals previously grappled with this question in *Arnold*, our court has not. In the two decades since *Arnold* was decided, courts have reached a consensus on this question, and the resulting majority rule of these courts accords with a proper reading of *Arnold*. Unfortunately, the majority has failed to properly apply or clarify *Arnold*.

¶91     Making matters worse, the majority does not provide guidance to the circuit court on how to proceed or give weight to the policy's provisions. The unfortunate reality is that Wisconsin homeowners now may see their insurance costs skyrocket as coverage is expanded to encompass the homebuilder's faulty workmanship.

¶92     I write separately because ensuing-loss provisions should be construed in alignment with the overwhelming majority of jurisdictions. By doing so, we give effect to the intentions of the contracting parties, apply ensuing-loss provisions as they were historically intended to work, and provide clarity to homeowners across Wisconsin. Instead, the majority fails to distinguish between rain damage caused by the construction defect and rain damage that would have occurred to a properly constructed house. Ensuing-loss provisions do not cover damages to a home caused by defective construction. In fact, such damage is specifically excluded in the policy. Here, the insured failed to produce any evidence that an independent cause of loss, distinct from the defective

---

[1] *Arnold v. Cincinnati Ins. Co.*, 2004 WI App 195, 276 Wis. 2d 762, 688 N.W.2d 708.

workmanship, caused damage to the home. Accordingly, I would reverse the court of appeals' decision and affirm the circuit court's grant of summary judgment dismissing the claim of coverage under the ensuing-loss exception. For these reasons, I respectfully dissent.

## II. DISCUSSION

¶93 Ensuing losses have been unclear for homeowners, insurance companies, and courts across the country. Inconsistent decisions, involving similar fact patterns, have created confusion as to what constitutes an "ensuing loss." *See Taja Invs. LLC v. Peerless Ins. Co.*, 196 F. Supp. 3d 587, 592–93 (E.D. Va. 2016) (acknowledging the split of authorities), *aff'd*, 717 F. App'x 190 (4th Cir. 2017) (per curiam). Although every court agrees that the cost to correct the original defect itself is never covered, *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1261–62 (10th Cir. 2020), how each jurisdiction determines which damages "ensue" from the excluded event—and are therefore covered— varies. Nonetheless, a majority rule has emerged, and Wisconsin's *Arnold*, when properly interpreted, accords with that majority rule.

### A. A MAJORITY OF COURTS CONSTRUE ENSUING-LOSS PROVISIONS NARROWLY, CONSISTENT WITH CONTRACT INTERPRETATION PRINCIPLES AND THE HISTORY OF ENSUING-LOSS PROVISIONS.

#### 1. The Majority Rule

¶94 A majority of courts construe ensuing-loss exceptions to provide coverage when damage is the result of an independent cause of loss. The Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Federal Circuit Courts of Appeal all take this narrow approach. Each holds that ensuing-loss provisions provide coverage only when the damage caused to the property is distinct and separate from the damage caused by the excluded defect itself. *See, e.g., Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 506 (5th Cir. 2000) (holding that ensuing-loss provisions are triggered only when a distinct and unrelated event caused damage); *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 579 (6th Cir. 2010) (declaring that if "damage came naturally and continuously from the faulty workmanship, unbroken by any new, independent cause, the exclusion applies and the ensuing loss provision does not" (citation modified)); *Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948, 953 (8th Cir. 2012) ("[T]he ensuing-loss provision excludes from coverage the normal results of defective construction, and applies only to distinct, separable, and ensuing

losses." (citation modified)); *Costco Wholesale Corp. v. Commonwealth Ins. Co.*, 45 F. App'x 646, 647 (9th Cir. 2002) (holding that movement of the Earth, which caused the warehouse's damages, was a distinct cause apart from the defective design); *Rocky Mountain Prestress*, 960 F.3d at 1262 ("A covered peril by definition is a peril that is not excluded, and thus by definition defective workmanship is not a covered peril, even if it may trigger a covered loss as a new causal agent or in combination with another cause.").[2]

¶95 In majority-rule jurisdictions, an insurer never pays (1) to fix the construction defect nor (2) for the damages resulting from the construction defect. Instead, these courts require distinct losses, each of a different kind, to trigger coverage under an ensuing-loss provision. *See Alton Ochsner Med. Found.*, 219 F.3d at 506 (ensuing-loss provisions contemplate a separate and distinct loss that is "different in kind, not merely different in degree"). Something besides the construction or workmanship defect must have caused the damages for there to be ensuing-loss coverage. Under the policy language, damage to property, expected to be caused by an excluded defect, is not an ensuing loss in a majority of jurisdictions.

¶96 In the construction context, the majority rule precludes damages that naturally result from defective construction. *See Friedberg*, 691 F.3d at 953 (excluding from ensuing-loss coverage "the normal results of defective construction" (citation modified)); *Alton Ochsner Med. Found.*, 219 F.3d at 507 (ensuing-loss provisions generally apply only to damage that "result[s] fortuitously from events *extraneous* to the construction process" (citation modified)); *TMW*, 619 F.3d at 579 (when "damage

---

[2] *Arnold* requires that "an ensuing loss must result from *a cause in addition to the excluded cause*." 276 Wis. 2d 762, ¶29 (emphasis added). The majority observes that *Arnold* "rejected the notion that the secondary cause needed to be a separate and independent peril." Majority op., ¶61 (citing *Arnold*, 276 Wis. 2d 762, ¶40). However, the court of appeals specifically took issue with the insurer's use of the term "peril," not necessarily with "separate and independent." *See Arnold*, 276 Wis. 2d 762, ¶38 ("[T]here is no requirement in the policy that a loss must be caused by a 'peril' in order to be covered."). For the reasons discussed *infra*, ¶¶19–26, a proper interpretation of *Arnold* demonstrates that it adopts the rationale, if not the exact language, used in majority-rule jurisdictions.

[comes] naturally and continuously from the faulty workmanship, unbroken by any new, independent cause, the exclusion applies and the ensuing loss provision does not" (citation modified)); *In Re Chinese Manufactured Drywall Prods. Liab. Litig.*, 759 F. Supp. 2d 822, 850–51 (E.D. La. 2010) (ensuing-loss provisions are inapplicable to damages that flow from the direct and continuous result of workmanship defect); *12W RPO, LLC v. Affiliated FM Ins. Co.*, 353 F. Supp. 3d 1039, 1060 (D. Or. 2018) (explaining that ensuing-loss provisions do not apply to damages that are the "natural and expected, as opposed to a separate and independent, result" of faulty workmanship (citation omitted)).

¶97    And in a majority of jurisdictions, when there are losses from construction defects and damage from natural elements, there is no insurance coverage. *Friedberg*, 691 F.3d at 953; *see Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338, 1341 (9th Cir. 1989) (holding that faulty workmanship clauses exclude "losses caused by defects in the design and construction of a building"). Such loss is not covered because one could reasonably expect rain, snow, and other weather to damage a defectively constructed home. In this case, the record is absent of an independent cause, other than the construction defect, that caused the rain to enter the house. Thus, for the ensuing-loss exception to apply under the majority rule, the homeowners must be able to show that the damage would have been sustained if the house had been properly constructed. On this record, the homeowners failed to present any such evidence creating a genuine factual dispute for trial.

¶98    While there are courts that construe ensuing-loss provisions broadly like this court does today, they are the minority. Those jurisdictions focus on the dictionary definition of "ensue." *See, e.g.*, *Leep v. Trinity Universal Ins. Co.*, 261 F. Supp. 3d 1071, 1083–84 (D. Mont. 2017) (defining "ensuing" as "to take place afterward or as a result," "to follow in order; come afterward, especially in immediate succession," or "to follow as a consequence; result" (citations omitted)); *Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 455, 462 (W.D. Ky. 2007) (relying upon the dictionary definition of "ensue" to interpret the provision's scope); *Goldner v. Otsego Mut. Fire Ins. Co.*, 336 N.Y.S.2d 717, 720 (App. Div. 1972) (using dictionaries to define "ensue"). They require insurers to cover all of the damages that result after the defect arises. *Platek v. Town of Hamburg*, 26 N.E.3d 1167, 1173 (N.Y. 2015); *see Bartram, LLC v. Landmark Am. Ins. Co.*, 864 F. Supp. 2d 1229, 1235 (N.D. Fla. 2012) ("[E]nsuing losses, if they resulted from a covered cause, are covered . . . regardless of whether the loss was naturally set in motion by an excluded cause of loss.").

### 2. *Majority Rule Effects Contracted-For Intentions.*

¶99    Interpreting ensuing-loss provisions by excluding damages that result from defective workmanship gives effect to the parties' intentions. That is, after all, the purpose of contract interpretation. *Wadzinski v. Auto-Owners Ins. Co.*, 2012 WI 75, ¶11, 342 Wis. 2d 311, 818 N.W.2d 819. Insurance contracts explain which liabilities the insurer will cover, and which they will disclaim. To further that end, courts do not rewrite insurance contracts against the insurer to bind the insurer for risks which are plainly excluded and for which it was not paid. *Limpert v. Smith*, 56 Wis. 2d 632, 640, 203 N.W.2d 29 (1973).

¶100   A home exists to protect its inhabitants from the elements. Failing to construct a home properly will naturally let the elements enter. *See TMW*, 619 F.3d at 576 ("When a policy excludes 'loss or damages . . . caused by or resulting from . . . faulty . . . workmanship . . . [or] construction' of a building, it should come as no surprise that the botched construction will permit the elements—water, air, dirt—to enter the structure and inside of the building and eventually cause damage to both." (alterations in original)). By excluding damages caused by the faulty construction of a home, the insurer disclaims responsibility for all damages associated with expected, elemental forces. When the insurance policy excludes those damages, recovery for damage caused by defective construction comes not from that policy, but rather comes from the construction company.

¶101   The parties' contract states that Cincinnati does "not insure 'physical loss' *caused by* . . . [f]aulty, inadequate or defective . . . [d]esign, specifications, workmanship, repair, construction" or the materials used in the defective construction. "[I]f the home's 'physical loss' is *caused by a* faulty, inadequate, or *defective construction*, this exclusion applies and damages are presumptively excluded from coverage." Majority op., ¶8 (emphases added). Then, the contract's ensuing-loss provision provides that "any ensuing 'physical loss' to Covered Property in Section I — Coverages A, B, and C not precluded by any other provisions in this policy is covered." The majority reads "physical loss" in the provision to include losses resulting directly "from the construction defect." *Id.*, ¶9. But that is not what the contract says. The contract explicitly excludes "'physical loss' *caused by* . . . [f]aulty, inadequate or defective . . . [d]esign, specifications, workmanship, repair, *construction*" and presumes that such damages are excluded. *Id.*, ¶8 (emphases added).

5

¶102   Simultaneously, a proper interpretation avoids eviscerating the exclusion. This ensuing-loss provision simply means when damage is caused by faulty workmanship, it is not covered by the policy. *See Friedberg*, 691 F.3d at 953 ("[W]hen water enters a home because of defective design, faulty workmanship, or faulty materials furnished in connection with construction or remodeling and causes damages, the damages are excluded from coverage under the 'errors, omissions, and defects' exclusion . . . ." (citation modified)); *see also 3534 E. Cap Venture, LLC v. Westchester Fire Ins. Co.*, 104 F.4th 913, 918 (D.C. Cir. 2024) (explaining that many courts require "some degree of distinctness" between the faulty workmanship and the damage, "lest coverage for the ensuing cause 'very nearly destroy' the exclusion" (quoting *Aetna Cas. & Sur. Co. v. Yates*, 344 F.2d 939, 941 (5th Cir. 1965) (Friendly, J., sitting by designation)). It prevents insureds from creatively linking losses to an excluded cause to obtain coverage.

¶103   But endorsing a broad approach writes the exclusion out of the policy because any damage caused by a defect in the construction can be recharacterized as an "ensuing loss" restoring coverage to the home. This broad interpretation renders the exclusion "inapplicable in [most] circumstances." Majority op., ¶9. What is the difference between "a loss caused by a construction defect," which "is not covered," and "a loss ensuing from the construction defect," which is? *Id.*, ¶10. In effect, the majority's reading excludes only the cost to correct the original construction defect and not the losses that the construction defect causes. *See id.*, ¶3 (holding that "any physical loss caused by rainwater constitutes an ensuing loss within the meaning of the policy"). That interpretation creates coverage for the exact dangers the parties originally excluded from coverage—an unreasonable outcome. *Phillips v. Nat'l Sec. Fire & Cas. Co.*, 59 So. 3d 711, 716 (Ala. Civ. App. 2010) (declining to interpret ensuing-loss provisions "to create coverage beyond the perils initially insured against"). It is an impermissible reading.

¶104   Instead, the contract should be read as it is written. The parties excluded the perils of defective construction from their insurance contract. That encompasses both (1) the defect itself and (2) the damages caused by the defect. By excluding damages "caused by" defective construction, the insurers disavowed liability for damages that flow "naturally and continuously" from the faulty construction, "unbroken by any new, independent cause." *TMW*, 619 F.3d at 579 (citation modified). That requires two separate events for the exception to be triggered. *Balfour*

*Beatty Constr., L.L.C. v. Liberty Mut. Fire Ins. Co.*, 968 F.3d 504, 512 (5th Cir. 2020). And involves an attenuation between the initial defect and the subsequent losses.

¶105 Transforming water that infiltrates through a construction defect into a separate, final causative element opens the door for any number of "last-in-time 'but for' causes of damage" that "are limited only by the imagination of the reader." *TMW*, 619 F.3d at 577. That inanity is precisely what the parties contracted against.

### 3. *The History of Ensuing-Loss Provisions.*

¶106 Ensuing-loss provisions were never intended to be as broad as the majority interprets them.[3] The original purpose of ensuing-loss

---

[3] Ensuing-loss provisions originated from a harrowing scene that unfolded across California. William L. Ellsworth, *Earthquake History, 1769–1989*, *in* THE SAN ANDREAS FAULT SYSTEM, CALIFORNIA: U.S. GEOLOGICAL SURVEY PROFESSIONAL PAPER 1515, at 159–61 (1990), https://pubs.usgs.gov/pp/1990/1515/pp1515.pdf. Residents awoke to an earthquake that demolished homes, particularly in San Francisco. Then, the fires erupted. James S. Harrington, *Lessons of the San Francisco Earthquake of 1906: Understanding Ensuing Loss in Property Insurance*, BRIEF, Summer 2008, at 28, 28. Twisted gas pipes and felled chimneys ignited fires across the city, which were exacerbated by the dynamite that the city used to create firebreaks. *Id.*; Carl Nolte, *The Great Quake: 1906–2006 / The Dynamite Disaster*, SFGATE (Apr. 13, 2006), https://www.sfgate.com/news/article/the-great-quake-1906-2006-the-dynamite-disaster-2520049.php. When the fires finally burned out, over 3,000 people had died and another 250,000 lost their homes. Harrington, *supra*, at 28. Thankfully, property insurers saved the city. Contemporary insurance contracts excluded damages caused by earthquakes. *Earthquake and Fire Digital Collection*, BANCROFT LIBR. OF THE UNIV. OF CAL. AT BERKELEY, https://digicoll.lib.berkeley.edu/ (last visited June 19, 2026). But they covered fire damage. *Id.* While the damage that the earthquake caused was an excluded event under the homeowners' all-risk policies, the fire damages that erupted separately from the earthquake itself remained covered. *The San Francisco Earthquake of 1906: An Insurance Perspective*, INS. INFO. INST., https://www.iii.org/article/san-francisco-earthquake-1906-insurance-perspective (last visited June 19, 2026). All told, the insurers covered 90% of the damage caused by the fires. The other 10% was excluded as earthquake damage. Eric Niderost, *The Great 1906 San Francisco Earthquake and Fire*, AM. HIST. (Apr. 2006), https://historynet.com/the-great-1906-san-francisco-earthquake-and-fire.

provisions "has been and remains to preserve coverage for insured losses, such as the fires after the San Francisco earthquake, and not to create a 'grant-back' through which coverage may be had for the original excluded loss, whether it be an earthquake, a design defect, or any other excluded cause of loss." James S. Harrington, *Lessons of the San Francisco Earthquake of 1906: Understanding Ensuing Loss in Property Insurance*, BRIEF, Summer 2008, at 28, 32. Ensuing-loss provisions prevent insureds from resurrecting coverage for explicitly excluded losses.

¶107  This makes sense. The liability for building a faulty home should lie with the builder—not the insurer who agreed to cover only those catastrophes that occur separately from the home's construction. By leaving the builder responsible for mitigating foreseeable damages, narrow interpretations put the responsibility for avoiding liability directly in the hands of the party best suited to avoid the damages in the first instance: the builder. Builders, in turn, expect these mishaps to occur from time to time. That's why they carry their own general liability and builders risk insurance.

### B.  WISCONSIN'S *ARNOLD* ALIGNS WITH THE MAJORITY RULE WHEN PROPERLY INTERPRETED AND APPLIED.

¶108  In Wisconsin, *Arnold v. Cincinnati Insurance Co.*, 276 Wis. 2d 762, defined ensuing losses for the first time. In *Arnold*, a couple noticed that the staining on the siding of their house was darkening from its original color. *Id.*, ¶5. The homeowners hired a contractor to strip the siding's stain, pressure wash the siding, apply a wood restorer and then re-stain it. *Id.*, ¶¶5–7. The stripping product damaged the windows, gutters, driveway, porch, patio, roof, doors, and the caulking around the windows. *Id.*, ¶10. Water from the pressure washer also seeped into the home damaging the home's interior. *Id.* Subsequently, the damaged seals around the windows and skylight allowed rain to leak into the home further damaging its interior. *Id.*, ¶36. The couple had a homeowners' policy that contained a faulty workmanship exclusion with a provision that reinstated coverage for ensuing causes of loss. *Id.*, ¶19.

¶109  The court of appeals held that ensuing losses are losses not directly caused by faulty workmanship, but nonetheless follow as a "chance, likely, or necessary consequence" of the loss caused by the faulty workmanship. *Id.*, ¶28. Unlike the minority of jurisdictions, the court did not strictly apply a dictionary definition. After defining "ensue," *Arnold* rejected one definition that defined "ensue" as "to follow in chronological

succession." *Id.*, ¶27 (quoting *Ensue*, WEBSTER'S THIRD INTERNATIONAL DICTIONARY 756 (1993)). In rejecting that definition, the court of appeals explained that an "ensuing loss is a loss that is *not directly* caused by faulty workmanship or faulty materials." *Id.*, ¶28 (emphasis added). Thus, not "all losses that follow and are a consequence of either faulty workmanship or faulty materials" are considered "ensuing losses." *Id.*, ¶29.

¶110　The court of appeals found *Richland Valley Products Inc. v. St. Paul Fire & Casualty Co.*, 201 Wis. 2d 161, 548 N.W.2d 127 (Ct. App. 1996), instructive. There, an ice cream manufacturer filled a helical coil with subzero temperature ammonia and submerged it into a vat filled with a brine solution of water and calcium chloride to keep its novelties frozen. *Richland Valley Prods.*, 201 Wis. 2d at 165. When the coil failed to keep the proper temperatures, engineers revealed that the welder who built the machines left holes in the coil and then galvanized and coated the holes with metal. *Id.* at 166. Over time, the metal coating deteriorated. *Id.* The exposed holes allowed the brine to enter the coil, which mixed together with the ammonia to create crystallized salts. *Id.* Those salts clogged the manufacturing facility's pipes and spread to its refrigeration system. *Id.*

¶111　The *Richland Valley Products* court determined that the welding error "caused the defect in the coil which led to the brine's entering the coil and mixing with the ammonia. Because the defect was due to faulty workmanship and manufacture, the resulting loss [was] excluded . . . ." *Id.* at 168. Next, the court decided whether the resulting contamination from the ammonia-brine mixture was covered as an ensuing loss. *Id.* at 174. Then, the court decided that "[c]ontamination occurred when brine entered the coil and mixed with the ammonia in it," meaning that "[t]he loss from the contamination is the impure ammonia." *Id.* And the salt that spread throughout the pipes and clogged the machine was also not an ensuing loss. *Id.* at 175. The court held that the circulated salt that clogged the "system resulted from the *initial* contamination itself." *Id.* (emphasis added). But "[h]ad the initial contamination resulted in fire, for example, that loss would have been covered under the ensuing loss clause." *Id.* at 176.

¶112　*Richland Valley Products* excluded the downstream effects of the original defect. It did not limit the excluded damage to simply the cost to replace the coil but instead, extended it to all damages that "resulted from the initial contamination itself." *Id.* at 175.

¶113 The *Arnold* court's application is consistent with *Richland Valley Products*. The court determined that damages must occur as a result of a distinct cause-in-fact. It held that "in addition to being a loss that follows as a chance, likely, or necessary consequence of the excluded loss, an ensuing loss must result from a cause *in addition to* the excluded cause." *Arnold*, 276 Wis. 2d 762, ¶29 (emphasis added). Accepting that interpretation of the insurance contract's ensuing-loss provision, the court of appeals then applied a three-part framework to determine whether the losses were covered as "ensuing losses." First, the court identified the losses caused by the faulty workmanship and faulty materials and excluded those losses. *Id.*, ¶34. Second, the court identified each ensuing loss, i.e., each loss that followed as a chance, likely, or necessary consequence from that excluded loss. *Id.* Lastly, for each ensuing loss, the court determined whether it is an excepted or excluded loss under the policy. *Id.*

¶114 Under the first part of the test, the court of appeals excluded "the loss[es] consisting of the deterioration of the caulking, the discoloration or other damage to the window frames and door frames, and the discoloration or other damage to other parts of the exterior of the house and the driveway" because they "were all caused only by faulty workmanship, faulty materials, or some combination of the two." *Id.*, ¶35. Because those losses fell within the terms of the exclusion, the insurance policy did not cover those losses. *Id.*

¶115 As for the water damages to the interior of the home, the court of appeals split the damages between those that stemmed from the unworkmanlike use of the pressure washer and those that resulted from the damaged caulking that allowed rain to enter the home. *Id.*, ¶36. It held that the water damage that occurred during the power washing was excluded because it was caused by faulty workmanship. *Id.*, ¶37. But the interior that was damaged by rain leaking in through the damaged caulking was not excluded because the rain was a separate "cause *in addition to* the excluded cause," and the rain fell into the policy's ensuing cause-of-loss-exception. *Id.*, ¶¶38–40 (emphasis added).

*The Majority Misinterprets and Misapplies* Arnold.

¶116 Unfortunately, in today's decision, the majority fails to correctly interpret and apply *Arnold*. The majority says that "*Arnold*'s interpretation is reasonable and deserves some prudentially grounded respect." Majority op., ¶62. But it then fails to recognize the distinction

10

that *Arnold* set forth regarding what damages are recoverable for each cause.

¶117 The independent cause of damages, from *Arnold*, is unaccounted for in the majority's application. In one breath, the majority recognizes that *Arnold* requires "an additional cause of loss to trigger the ensuing loss exception." Majority op., ¶63. In the next, it holds that the damages "caused by the rainwater that came *as a consequence of the construction defect* would be an ensuing loss." *Id.*, ¶67 (emphasis added). That ignores *Arnold*'s command that an additional cause of loss must exist to trigger the ensuing-loss exception. In other words, the majority does not follow *Arnold*; it expands it beyond recognition.

¶118 Focusing on the rain in *Arnold* distracts from the true causal event. The rain in *Arnold* entered into the home only as a result of the damage to the caulking and windowsills. The insurer was liable only for the losses caused by rain that entered because of the broken caulking—an attenuated event that constituted an independent cause of damage. But here, all the damages derive from the construction defect itself.[4] Nothing ensued to allow water to damage the insured home; all the damage came directly from water entering the home as a result of defective construction. At a minimum, the homeowners have not demonstrated what damage would have occurred had the house been properly constructed.

¶119 Does the majority really intend for the extensive coverage its interpretation of *Arnold* provides? Homes provide shelter. Shelters protect individuals from the elements. If a shelter is built defectively, then the "chance, likely, or necessary consequence" of elemental damage to a new build is highly likely, particularly here in Wisconsin. Accordingly, in the home-construction context, construing *Arnold* broadly effectively holds insurers liable for all damages that stem from shoddy homebuilding, even though the policy precludes it. *Arnold*, properly applied, undermines the majority's conclusion. Instead, our jurisprudence should follow the majority of jurisdictions that apply ensuing-loss provisions narrowly,

---

[4] The crux of the issue before us is not the $10,000 fungi issue. Cincinnati Insurance already satisfied its liability for fungal damages by tendering "the maximum $10,000 fungi wet/dry rot coverage available under the [policy's] Fungi Limit," which the homeowners accepted. My dissent is directed to the primary issue in the majority opinion: its application of *Arnold*.

emphasizing the "cause in addition to" language in *Arnold*. 276 Wis. 2d 762, ¶29. That leaves *Arnold* intact. That accounts for the secondary-cause requirement in *Arnold*. And, that resolves the case before us.

### III.  CONCLUSION

¶120   Ensuing losses are losses that are distinct from the losses that are explicitly excluded by the insurance contract. The provision itself indicates that there are two events: (1) an event that is excluded from coverage, including everything caused by that event, and (2) a distinct event that causes a second, ensuing loss. To prevent the exception from swallowing the exclusion, a majority of jurisdictions favor an interpretation that requires proof of separate losses, not those that result from the defect itself.

¶121   By broadly interpreting *Arnold* and ensuing-loss provisions, this court abandons *Arnold*'s two-cause framework, furthering confusion for insureds and insurers alike. It allows the policy's exception to swallow the policy's exclusion by providing insurance coverage for damages caused by a construction defect. Instead, in cases like this, our jurisprudence should require proof of what damages were caused by the construction defect and what damages were caused by the independent event.

¶122   It is peculiar to think that an excluded risk can "become compensable because in a philosophical sense it can also be classified as water damage." *Yates*, 344 F.2d at 941. But that is precisely what the majority's decision has done.

¶123 Respectfully, I would affirm the circuit court's grant of summary judgment, and accordingly, I dissent from the majority's opinion.